**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GUSTAVO A. RENDON | : | |
| | : | |
| Appellant | : | No. 780 MDA 2022 |

Appeal from the Judgment of Sentence Entered April 11, 2022
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s):  CP-36-CR-0002160-2020

BEFORE:   STABILE, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED: APRIL 18, 2023**

Appellant Gustavo A. Rendon appeals from the judgment of sentence entered in the Court of Common Pleas of Lancaster County following his conviction by a jury on two counts of rape of a child, one count of statutory sexual assault, two counts of involuntary deviate sexual intercourse with a child, four counts of aggravated indecent assault of a child, two counts of sexual assault, four counts of aggravated indecent assault (complainant less than 13 years old), one count of aggravated indecent assault (complainant less than 16 years old), two counts of incest, two counts of photograph/film/depiction on computer sex act-child, five counts of indecent

_____

[*] Former Justice specially assigned to the Superior Court.

assault (person less than 13 years of age), and five counts of corruption of minors.[1]  After a careful review, we affirm.

The relevant facts and procedural history are as follows: Appellant was charged with various sex offenses in connection with the abuse of his biological children between August 2003 and March 2010 at various locations in Lancaster and Berks County in Pennsylvania.  On November 1, 2021, Appellant, who was represented by counsel, proceeded to a jury trial.

At trial, Appellant's ex-wife, R.R., testified she married Appellant in 1991, and she filed for divorce in the summer of 2021. She and Appellant have six biological children: L.E.R. (born in 1995), L.R.R. (born in 1997), B.L.R. (born in 1999), A.R.R. (born in 2002), B.E.R. (born in 2006), and K.R. (born in 2008).  The family moved to Pennsylvania in 2003 to join an anabaptist church, Ephrata Christian Fellowship, in Lancaster.  N.T., 11/1/21-11/3/21, at 115.  The family lived on Millstone Drive in Lancaster from 2003 to the fall of 2007, Slouch Drive in Mohnton from the fall of 2007 to the summer of 2008, and Pleasant Valley Drive in Denver from the summer of 2008 to the fall of 2011.

R.R. testified she homeschooled the six children while Appellant worked different construction-related jobs outside of the home.  *Id.* at 119-20.  She noted Appellant sometimes took one child with him when he was working, and

---

[1] 18 Pa.C.S.A. §§ 3121(c), 3122.1, 3123(b), 3125(b), 3124.1, 3125(a)(7), 3125(a)(8), 4302, 6312(b), 3126(a)(7), and 6301(a)(1), respectively.

the children "went on different outings with him." *Id.* at 120. She further noted he sometimes took the children separately to church, as well as watched them in the home at times when she was not at home. *Id.* R.R. indicated that, during the fall of 2007, she stayed in Tennessee for five days to help her parents. *Id.* at 123. She also regularly attended "sisters' meetings at church" by herself or with a few of her children. *Id.* R.R. testified she suffered from various illnesses, which "oftentimes" required her to "stay in bed." *Id.* at 121.

R.R. denied she ever saw Appellant sexually abuse any of the children. *Id.* at 122. She also denied that, from 2003 to 2010, any of the children told her they were being abused. *Id.* She indicated that, from late 2008 into most of 2009, Appellant was "gone from the home" for work. *Id.* at 124. She noted that when he returned to the home after this nine-month absence he was often angry and unpredictable. *Id.* R.R. sought help from the church, and on March 27, 2010, after Appellant met with church leaders, he came home and began burning items, which were stored in his private office. *Id.* at 125. R.R. became afraid and called church leaders, who arrived at the home and escorted Appellant away from the home. *Id.* Although he asked to return, R.R. did not permit Appellant to return to the family home after March 27, 2010. *Id.*

R.R. testified she continued to communicate with Appellant, who provided financial support for her and the children. *Id.* at 126. The children had no contact with Appellant after March 27, 2010, until April 7, 2020, when

L.R.R. confronted Appellant with allegations that he had sexually abused her in the past. *Id.* at 127, 132. R.R. testified that L.R.R. had not spoken to Appellant in the prior ten years. *Id.* at 132. In response to L.R.R.'s allegations, Appellant decreased the family's financial support. *Id.*

L.E.R. testified she has a "vivid memory" of an event, which occurred in the living room of the family's house on Millstone Drive during the summer when she was turning twelve. *Id.* at 171. Specifically, she testified:

> My father came in and undressed me, and he had a camera that he took lots of pictures of me with it when I was naked. And then he raped me and fondled me all over and penetrated me with his fingers and kissed me before he picked up the camera and left….He forced his penis into my vagina.

*Id.*

She testified that, prior to this event, when she was about eight years old, Appellant raped, fondled, and penetrated her while they were upstairs in the bedroom of the Millstone Drive house. *Id.* at 172. She testified that, after the family moved to the house on Slouch Drive:

> [Appellant] repeatedly sexually abused [her] in the bathroom,…in [her] parents' bedroom, in [her] bed, on the couch downstairs, [in] the living room, and in his office. He did all of the same things; he raped [her] and fondled [her] all over, kissed [her] all over, [and] penetrated [her] with his fingers.

*Id.* at 173.

She testified that, after the family moved to the house on Pleasant Valley Drive, she remembers one time when she was in her parents' bedroom, and Appellant "raped [her] in the bed[.]" *Id.* She yelled for Appellant to stop,

but he did not. *Id.* at 174. L.E.R. admitted she did not tell her mother about the abuse until the summer of 2018; however, her mother couldn't "deal with it." *Id.* at 176. She did not speak about the abuse again until March of 2020, when she told her sister, L.R.R., about the sexual abuse. *Id.* at 177. L.R.R. told her the same things "happened to her too[.]" *Id.* At this point, L.R.R. called the police to report the sexual abuse. *Id.*

L.R.R. testified she has a "vivid memory" of Appellant taking her to work with him on her eighth birthday. *Id.* at 199. She testified when the other workers left for lunch Appellant "took [her] into the bathroom and took [her] clothes off and he raped [her]. And he made [her] touch his penis….And he put it in [her] mouth." *Id.* She clarified by "rape" she meant Appellant put his penis in her vagina. *Id.*

She testified that, on a different occasion, Appellant took her to a small building and took pictures of her while she was naked. *Id.* at 200. She testified that, on a separate occasion, Appellant took her to a "white cement building" where Appellant, as well as other men, took turns raping her. *Id.* at 201-02. The family was living at the house on Millstone Drive when the incident at the "white cement building" occurred. *Id.* at 202. She also remembers a time when the family lived in a house on Slouch Drive and, after the rest of her family left for church, Appellant took her "to the bathroom and raped [her]." *Id.* In another incident, Appellant took her to "a car garage in New Holland[,]" where a big guy in overalls pulled off her clothes. *Id.* at 203.

The men, including Appellant, "started like raping [her]….[She] thought they were going to kill [her]." *Id.* She was ten or eleven years old when this incident occurred. *Id.*

L.R.R. admitted she did not initially tell her mother, her sisters, her maternal grandparents, or church leaders about the abuse because she was afraid and embarrassed. *Id.* at 204, 221. Appellant had convinced her the abuse was her fault. *Id.* at 221. In 2018, for the first time, she told her mother about the abuse, and her mother told her "there's no way that ever happened to you. If it happened to any of you guys, it was only your sister, [L.E.R.]." *Id.* at 206. L.R.R. indicated in 2020 she reached out to her local state representative, who gave her the telephone number for the Attorney General's Office, and she reported the abuse. *Id.* at 207.

B.L.R. testified she has a memory of being in bed with Appellant in a hotel room when she was nine years old. *Id.* at 252. Appellant touched her "genitals with his hands and his mouth. And he stuck his penis up inside [her]." *Id.* She indicated there were other times he touched the inside and outside of her genitals with his penis, mouth, and hands; however, she could not remember when these other incidents occurred. *Id.* at 253. She indicated these incidents occurred while she was living on Millstone Drive, Slouch Drive, and Pleasant Valley Drive in Pennsylvania. *Id.* at 268. B.L.R. never told her mother about the abuse because she feared her mother would be mad. *Id.* at 254.

- 6 -

B.L.R. indicated that in 2020 her mother asked her if she had anything she wanted to say to the police. *Id.* at 256. B.L.R. testified she did not want to tell her mother whether she had anything to say to the police; however, she told her sister, L.R.R., that she wanted to speak to the police. *Id.* Thereafter, B.L.R. reported the sexual assaults to the police. *Id.*

A.R.R. testified she has "strong memories" from when the family lived in a house on Pleasant Valley Drive. *Id.* at 274. She remembers several occasions when she was seven or eight years old when Appellant would "take his fingers and he would feel up in [her] vagina" while she was in bed at night. *Id.* at 275. She also has a memory of being in the church's nursery with her pants off, and Appellant's hands were feeling her all over. *Id.* She admitted she never told her mother about the sexual abuse because she was scared, and she never told her maternal grandparents because she was ashamed. *Id.* at 276, 281. A.R.R. testified that, in April of 2020, L.R.R. asked her if Appellant had ever "done anything" with her. *Id.* at 277. A.R.R. answered affirmatively, and she then spoke to the police. *Id.*

B.E.R. testified she has a memory from when the family lived on Pleasant Valley Drive. She was wearing a white dress with red flowers. *Id.* at 301. Appellant lifted her dress and touched her all over. *Id.* B.E.R. never told anyone about the incident because she was "embarrassed, and [she] didn't want people to know that happened to [her]." *Id.* at 304.

Danielle Harvey, a sexual assault counselor and educator, testified victims have varied reactions to sexual abuse. *Id.* at 317. Child victims tend to be less willing to disclose the sexual abuse, as do victims who are isolated from others. *Id.* at 320-21. She testified that, "[e]specially with children, the more often the abuse occurs, the more they begin to think of it as normal. When…somebody experience[s] abuse from a young age on a regular basis, it becomes as normal as brushing your teeth." *Id.* at 321.

Julie Stover, a women's health nurse practitioner at LGH Penn Medicine, testified she saw B.L.R., B.E.R., and A.R.R. on April 14, 2020. She noted that the victims, as well as their mother, declined to have Nurse Stover conduct a gynecological examination upon the victims. *Id.* at 348. In any event, Nurse Stover testified that, given the amount of time that had passed from when the sexual assaults occurred, she would have expected to see "a normal exam[.]" *Id.* at 350.

Pennsylvania State Police Trooper Corey Wardrop testified he interviewed L.E.R. and L.R.R. in early 2020. They disclosed they had been "abuse[d] at the hands of their father[, Appellant]." *Id.* at 363. He indicated he asked L.E.R. and L.R.R. to ask their sisters if they had also been abused by Appellant. *Id.* at 364. After he was informed A.R.R., B.L.R., and B.E.R. had memories of being abused, he arranged for them to be interviewed at the Children's Alliance in April of 2020. *Id.* at 365.

Trooper Wardrop testified that, on approximately April 24, 2020, he arrested Appellant, and after Appellant waived his **Miranda**[2] rights, the trooper interviewed him. When the trooper confronted Appellant with the allegations made by his children, Appellant had no answer. **Id.** at 385.

At the conclusion of all testimony, the jury convicted Appellant of the offenses indicated *supra*. Thereafter, following the preparation of a pre-sentence investigation report, as well as an assessment by the Sexual Offender Assessment Board, Appellant, who was still represented by counsel, proceed to a sentencing hearing on April 11, 2022. The trial court sentenced Appellant to an aggregate of 63½ years to 155 years in prison, as well as found Appellant to be a sexually violent predator.

Appellant filed a timely counseled post-sentence motion presenting a weight of the evidence claim, and the trial court denied the motion on April 20, 2022. This timely counseled appeal followed, and all Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant sets forth the following issues in his "Statement of Questions Involved" (verbatim):

1. Did the Commonwealth commit prosecutorial misconduct by implying that the jury would have to recite the verdict directly to the victims and tell them they are liars if there is an acquittal?

2. Did the trial court err in failing to issue a proper curative instruction after the prosecutor implied that a not guilty verdict

---

[2] **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602 (1966).

would require the jury to specifically confront the victims and call them liars?

3. Did the trial court err in entering a judgment of guilty, where the jury's verdict was against the weight of the evidence produced at trial on every count?

Appellant's Brief at 6 (suggested answers omitted).

Appellant's first and second issues are intertwined. Specifically, Appellant contends the prosecutor committed misconduct during closing argument when he suggested that, if the jury acquitted Appellant, the jurors would have to face Appellant's accusers and tell them they had lied about the sexual abuse. He further contends the trial court's jury instruction was inadequate to cure the prejudice resulting from the prosecutor's improper statements.

Our standard of review of a claim of prosecutorial misconduct during closing arguments to the jury is whether the trial court abused its discretion. **_Commonwealth v. Jones_**, 191 A.3d 830, 835 (Pa.Super. 2018).

> [W]ith specific reference to a claim of prosecutorial misconduct in a closing statement, it is well settled that any challenged prosecutorial comment must not be viewed in isolation, but rather must be considered in the context in which it was offered. Our review of a prosecutor's comment and an allegation of prosecutorial misconduct requires us to evaluate whether a defendant received a fair trial, not a perfect trial. Thus, it is well settled that statements made by the prosecutor to the jury during closing argument will not form the basis for granting a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict. The appellate courts have recognized that not every unwise remark by an attorney amounts to misconduct or warrants the grant of a new trial. Additionally, like the defense, the prosecution is accorded reasonable latitude,

- 10 -

> may employ oratorical flair in arguing its version of the case to the jury, and may advance arguments supported by the evidence or use inferences that can reasonably be derived therefrom. Moreover, the prosecutor is permitted to fairly respond to points made in the defense's closing, and therefore, a proper examination of a prosecutor's comments in closing requires review of the arguments advanced by the defense in summation.

*Id.* at 835-36 (quoting **Commonwealth v. Jaynes**, 135 A.3d 606, 615 (Pa.Super. 2016)). **See Commonwealth v. Clancy**, 648 Pa. 179, 192 A.3d 44, 62-63 (2018) (endorsing a two-part test to review a prosecutor's remarks: (1) whether the substance of the remarks relate to the elements of the crimes charged, the evidence presented, and constitute a fair and reasonable rebuttal to the defense's arguments, and (2) whether the unavoidable effect of the remarks was to prejudice the jury against the defendant); **Commonwealth v. Chmiel**, 585 Pa. 547, 889 A.2d 501, 544 (2005) ("Prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair.") (citations omitted)).

Moreover, "[p]rosecutorial misconduct is evaluated under a harmless error standard." **Commonwealth v. Brown**, 134 A.3d 1097, 1106-07 (Pa.Super. 2016) (citation omitted). A trial court may issue a curative instruction to remove taint unless after a review of all the circumstances it determines that a curative instruction would be insufficient, warranting the extreme remedy of a mistrial. *Id.*

In the case *sub judice*, the prosecutor relevantly stated the following during closing argument:

So, let's talk about the elements and the crimes and what facts you are given to support the elements. I said this in opening. Your job is to determine the facts, apply them to the elements of the crimes.

***

[W]e didn't just give you the five girls and rest our case. This is the most important thing. I don't want you to listen to me or believe me because I say so, because they are the Commonwealth's victims, because I believe them or the trooper believes them. That's not what I want at all. I want you to look at this other evidence that we gave you, look at the objective reasons why these kids should be believed in this case. That's what I want to offer.

***

The fact that we have five victims, what you are going to eventually have to decide is, are all five of them lying and is he the only one telling the truth?

***

Which brings me to my next point; your observations of them. And this is maybe the most important one. So [Defense] Counsel spent a lot of time picking and choosing random slices of their testimony mashing them together on a Power Point and saying they're obviously lying. This is not how this works. That's why it's so important that we don't do this by video, we don't do this by submitting an affidavit of a sworn statement. You guys have to see them, and you have to see them from start to finish. So, I ask you, who do you see up here? Who were those five girls? Were they five masterminds who committed a number of crimes up until and including perjury for no reason in front of you, that concocted this scheme for no reason? Is that what you saw?

***

So, I told you in opening that your job here is straightforward and simple. And I didn't say to you, it's easy. It's never easy making a decision in cases like this. But your analysis is easy. **If you guys believe all five of those girls got up here and lied to you, I want you to go back there and find him not guilty. As a matter of fact, I want you to come back out here. They will be sitting there. I want you to say, I heard your story, [L.E.R.], you are a liar; [L.R.R.], liar; [B.L.R.], you're a liar; [A.R.R.], you're a liar; [B.E.R.], you're a liar. The only way you find this man not guilty is if 12 of you**

- 12 -

**agree on that, because it's the bottom line.** Someone is telling you the truth, and someone is not. So is that what you guys want to believe? Do you want to believe that's what you saw? Or do you want to believe you saw five girls get up here one-by-one and talk about something that was unimaginable and horrific, talk about their life, their life as a child, their daily life being sexually abused by their father?...Now you guys have a choice. Your choice is, what do you want to believe?

N.T., 11/1/21-11/3/21, at 443, 448-50, 458-60 (bold added).

At the conclusion of the prosecutor's closing argument, defense counsel objected to the above-bolded excerpt and requested the trial court give a curative instruction. *Id.* at 461-62. Specifically, defense counsel contended the prosecutor improperly suggested that, if the jury acquitted Appellant, they would have to "confront or face these girls in the courtroom," and the trial court should give a curative instruction "so the jury knows that's not a thing." *Id.* at 461. The trial court indicated it would "add something to [the jury] instructions." *Id.* at 462.

Thereafter, during its instruction to the jury, the trial court relevantly provided the following:

> [I]t's not the attorneys' recollection, it's not my recollection; it is your recollection that controls. You are not bound by any argument which in any way reflects the attorneys' personal beliefs as to what the evidence is or what the evidence shows.
>
> ***
>
> As judges of the facts, you are the sole judges of the credibility of the witnesses and their testimony. This means you must judge the truthfulness and accuracy of each of the witness's testimony and decide whether to believe all, or part or none of that testimony.
>
> ***

- 13 -

The opinions of counsel are not part of the evidence, and you should not consider them as such….It is the right and duty of each attorney to discuss the evidence in a manner that is most favorable to the side that he or she represents.

***

You, the jurors, are the sole judges of the facts, and it will be your responsibility to consider the evidence, to find the facts and applying the facts as you find them, to decide whether the defendant has been proven guilty beyond a reasonable doubt.

Your decision in this case, as in every case, is a matter of considerable importance. Remember it is your responsibility as jurors to perform your duties and to reach a verdict based upon the evidence as it was presented during the trial….You should keep your deliberations free of any bias or prejudice. Both the Commonwealth and the defendant have the right to expect you to consider the evidence conscientiously and to apply the law as I have outlined it for you.

Your role as a juror is to render a true and correct verdict based upon the facts as you find them to exist and the applicable law. Your verdict should be unbiased and free from any passion. Your verdict is not intended to serve as a sign or a signal or message to anyone else, nor is it designed to confront any witnesses from which you may or may not have heard in this case. In arriving at a verdict, you should not concern yourself with any possible future consequences of your verdict, including what the penalty might be should you find the defendant guilty.

*Id.* at 464, 466, 472, 489-90.

After the trial court gave this instruction, defense counsel objected on the basis the instruction did not adequately address the prosecutor's closing statements suggesting the jurors would have to confront the victims after they rendered their verdict. *Id.* at 492. The trial court responded that its instruction addressed defense counsel's concerns and, to the extent defense counsel disagreed, he "had an exception" on the record. *Id.*

- 14 -

Here, in addressing Appellant's claim of prosecutorial misconduct, as well as whether the trial court's instructions adequately ameliorated potential prejudice, the trial court relevantly indicated the following:

In this matter, the Commonwealth's case largely rested upon the credibility of the testimony of five of Appellant's biological children, who were claiming sexual abuse at the hands of their father. Accordingly, the theory of the defense was to forcefully attack the credibility of the [five] victims. As such, Appellant's [defense] counsel largely based his closing argument on potential inconsistencies and plausibility claims regarding the testimony of each of the five victims. In response thereto, during his closing argument, the attorney for the Commonwealth discussed the fact that there were five testifying witnesses, the specific detailed nature of their disclosures, and rebutted defense counsel's allegations of purported inconsistencies in the statements of the [five] victims. The currently challenged commentary of the prosecutor was clear[ly] offered to demonstrate to the jury that the decision in this matter rested heavily upon a credibility determination as to the witnesses presented by the Commonwealth witnesses. Although this commentary was offered with oratorical flair, it was offered in direct response to the arguments made by Appellant's [defense] counsel and did not rise to the level of prejudicing the jury, forming in their minds fixed bias and hostility toward [Appellant] so that they could not weigh the evidence objectively and render a true verdict. Accordingly, [the trial court] concludes that the commentary did not deprive [Appellant] of a fair trial.

\*\*\*

[In any event,] [f]ollowing the closing argument for the Commonwealth at trial, counsel for Appellant offered an objection [regarding] the commentary discussed above. At such time, defense counsel argued that the prosecutor implied that if there was an acquittal, the jury would have to face the victims in the courtroom. Counsel requested a curative instruction so as to clarify to the jury how the verdict would be delivered. Counsel for Appellant renewed his objection following the [trial] court's final instructions. Although, for the reasons noted above, the [trial] court did not deem the commentary of the prosecutor to be of an objectionable or prejudicial nature, the court did offer a clarifying instruction to the jury [as indicated *supra*].

- 15 -

***

In this matter, the totality of the [trial] court's charge to the jury, including the excerpt noted above, clearly instructed the jury that their verdict was to be free from any bias or prejudice and must not serve to confront any involved individual….[Thus,] this claim must fail.

Trial Court Opinion, filed 7/14/22, at 7-9 (citations to record omitted).

We agree with the trial court's sound reasoning and conclude Appellant is not entitled to relief. **See Jones**, **supra**. Initially, we note that it is clear from the record that credibility was a principal concern in this case. The Commonwealth's case focused on the victims' side of the story with defense counsel attempting to discredit them. During closing argument, defense counsel contested at length the credibility of the victims, and thus, the prosecutor was able to appropriately respond. As the trial court suggested, the prosecutor's comments represented a vigorous response to the defense within the bounds of permissible oratorical flair, and in any event, the prosecutor's comments did not have the unavoidable effect to prejudice the jurors by forming in their minds a fixed bias and hostility in such a manner as to impede their ability to weigh the evidence objectively and render a true verdict. **See** Trial Court Opinion, filed 7/14/22, at 7-8; **Clancy**, **supra**.

Further, we note that, even if the prosecutor's comments were prejudicial, "the cumulative effect of [the trial court's] instructions was to remove any prejudice that might otherwise have inured by the prosecutor's

[statements]." ***Commonwealth v. Baez***, 554 Pa. 66, 720 A.2d 711, 730 (1998) (citations omitted).

Specifically, contrary to Appellant's assertion, we conclude the trial court's jury instruction ameliorated any suggestion by the prosecutor that, if the jury acquitted Appellant, they would have to confront the victims and tell them they had lied about the sexual abuse. Simply put, the trial court informed the jury that, in rendering their verdict, they should be unbiased and free from any passion; their verdict would not serve as a sign, signal, or message; their verdict was not designed to be a confrontation of a witness; and they should not concern themselves of any possible future consequences of their verdict. N.T., 11/1/21-11/3/21, at 490. The jury is presumed to have followed these instructions. ***See Commonwealth v. Thompson***, 660 A.2d 68 (Pa.Super. 1995). Thus, we find Appellant is not entitled to relief as to his first and second appellate issues.

In his final issue, Appellant contends the jury's verdicts are against the weight of the evidence. Specifically, Appellant avers the victims' testimony was incredible since, if their accusations against Appellant were true, it "would amount to a massive family coverup or unheard idle blindness to horrific events by one human being to another." Appellant's Brief at 26. Appellant contends that, since the victims admitted they did not tell anyone, including each other or their mother, about any alleged sexual abuse until many years after Appellant left the home, their testimony is incredible. ***Id.*** at 26-27.

Appellant further contends it defies logic that the victims were repeatedly raped by Appellant, yet no one in the household every witnessed any such incidents. *Id.* at 27-28. He also notes there is no physical evidence, including testimony related to blood or fluid on the children's bedsheets, supporting the victims' rape allegations. *Id.* at 28-29. Thus, Appellant contends the jury's verdicts are against the weight of the evidence.[3]

When considering challenges to the weight of the evidence, we apply the following precepts. "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa.Super. 2015) (quotation marks and quotation omitted). Resolving contradictory testimony and questions of credibility are matters for the finder of fact. *Commonwealth v. Hopkins*, 747 A.2d 910, 917 (Pa.Super. 2000). It is well-settled that we cannot substitute our judgment for that of the trier of fact. *Talbert*, *supra*.

Moreover, appellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the post-sentence motion; this Court does not review the underlying question of whether the verdict is against the weight of the evidence. *See id.*

---

[3] Appellant adequately preserved his weight claim in his post-sentence motion, as well as his court-ordered Pa.R.A.P. 1925(b) statement. *See* Pa.R.Crim.P. 607; Pa.R.A.P. 1925(b).

Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Id.* at 546 (quotation omitted). Furthermore, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Id.* (quotation marks and quotation omitted).

Here, in rejecting Appellant's weight of the evidence claim, the trial court relevantly indicated "the Commonwealth relied upon the testimony of numerous witnesses in support of the charges filed against Appellant." Trial Court Opinion, filed 7/14/22, at 10. For instance, the victims' mother, R.R., testified the victims, who were children at the time of the abuse, were often in Appellant's sole care. *Id.* Further, R.R. testified that, when Appellant left the family home for the final time, he "burned and destroyed items from his home office, which had previously been off limits to every other family member." *Id.* Moreover, after L.R.R. first confronted Appellant about the sexual abuse, he decreased his financial support of the family. *Id.*

The trial court further noted that each victim testified in specific detail about the sexual abuse perpetrated upon them by Appellant. *Id.* at 11-14. The victims, who were homeschooled, testified about their childhood isolation,

as well as their fear of Appellant. As the trial court noted, the Commonwealth presented the expert testimony of a sexual assault counselor and educator, Ms. Harvey, who explained the reasons children often fail to disclose sexual abuse in a timely manner, if at all. *Id.* at 13. As to physical evidence of abuse, the Commonwealth presented testimony from Nurse Stover indicating that such evidence often does not exist in sex abuse cases, particularly when such abuse is disclosed years later.

In sum, the trial court indicated:

> Based upon the volume and specificity of the evidence presented at trial by the Commonwealth, Appellant has failed to demonstrate that the verdicts are so contrary to the evidence as to shock one's sense of justice. It is clear that the jury, as finder of fact, chose to find the Commonwealth's evidence to be credible. Accordingly, Appellant's claim in this regard fails.

*Id.* at 14.

We conclude the trial court did not abuse its discretion in denying Appellant's challenge to the weight of the evidence. *Talbert*, *supra*. We note the jury was free to determine the weight to be given to each witness's testimony, as well as reject Appellant's theory that the victims made up the allegations of sex abuse. Further, the jury was free to weigh what effect, if any, the absence of physical evidence had as to the credibility of the victims' testimony regarding the sex abuse. Appellant requests that we re-weigh the evidence and assess the credibility of the witnesses presented at trial, we decline to do so as it is a task that is beyond our scope of review. *See Commonwealth v. Collins*, 70 A.3d 1245, 1251 (Pa.Super. 2013) (stating

that "[a]n appellate court cannot substitute its judgment for that of the finder of fact"). Accordingly, we find no merit to Appellant's weight of the evidence claim.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/18/2023